# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 97-3097

_____

| | | |
|---|---|---|
| Beverly Enterprises, doing business as Lynwood Health Care Center, Minnesota, Inc., | * * * * | |
| Petitioner, | * * | |
| v. | * * | |
| National Labor Relations Board, | * * * | Petitions for Review of an Order of the National Labor Relations Board. |
| Respondent, | * * | |
| Minnesota's Health Care Union, Local 113 SEIU, | * * * | |
| Intervenor on Appeal. | * | |

_____

No. 97-3326

_____

| | | |
|---|---|---|
| Beverly Enterprises, doing business as Lynwood Health Care Center, Minnesota, Inc., | * * * * | |
| Respondent, | * * * | |
| v. | * * | |

National Labor Relations Board,         *
                                 *

      Petitioner.         *

———————

Submitted: March 11, 1998

Filed: July 13, 1998

———————

Before WOLLMAN and HANSEN, Circuit Judges, and GOLDBERG,[1] Judge.

———————

WOLLMAN, Circuit Judge.

Beverly Enterprises -- Minnesota, Inc., d/b/a Lynwood Health Care Center (Beverly), petitions for review of a final order of the National Labor Relations Board, that Beverly had violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 151-169, by refusing to recognize and bargain with Minnesota's Health Care Union, Local 113, Service Employees International Union, AFL-CIO, as the certified collective bargaining agent for its nurses. The Board has cross-petitioned for enforcement of its order, and the Union has intervened in support of the order. We deny the petition for review and enforce the order.

## I.

Beverly owns and operates a 54-bed nursing home in Fridley, Minnesota. This facility employs ten full or part-time licensed practical nurses (LPNs) and eight registered nurses (RNs). In addition, the home employs twenty-eight registered nursing assistants (NARs). The parties have stipulated that four of the RNs are supervisors

---

[1]The HONORABLE RICHARD W. GOLDBERG, Judge, United States Court of International Trade, sitting by designation.

within the meaning of section 2(11) of the Act (29 U.S.C. § 152(11)). The status of the remaining four RNs and of the ten LPNs (hereinafter, collectively, "the nurses") is the question to be resolved in this appeal.

The duties and responsibilities of the nurses are essentially identical. Each serves as a team leader in the care of nursing home residents assigned to their particular team. Teams are generally composed of one nurse and two NARs. Three teams are typically scheduled during the day shift, which runs from 6:00 a.m. to 2:30 p.m., and during the evening shift, which runs from 2:00 to 10:30 p.m. One team is scheduled during the night shift, which runs from 10:00 p.m. to 6:30 a.m. The overlap in these shifts is designed to aid the departing shift in reporting patient care concerns to the incoming shift and in completing paperwork. Assigning and scheduling teams to a particular shift is the responsibility of the unit manager.

The nursing department's four stipulated supervisors -- the Director of Nursing Services, the Assistant Director of Nursing Services, the Unit Manager, and the Resident Care Coordinator -- typically work ordinary daytime hours and are not on the premises during nights or weekends. Regulations promulgated by the State of Minnesota require that a nursing home must designate a particular person to be in charge of the facility when an administrator is not present. To comply with this regulation, Beverly generally designates one of its on-duty nurses as "charge nurse" whenever no stipulated supervisors are present. Whichever nurse has been designated as charge nurse thus become the highest ranking employee on the premises. The record indicates that one of the four stipulated supervisors is always available for consultation via telephone or pager.

The nurses possess authority to alter break schedules and patient care priorities, oversee and monitor the performance of NARs, seek volunteers to fill shift vacancies created when NARs are absent, initial NAR time cards, report disciplinary problems, and evaluate NARs. In addition, the nurses have authority to issue disciplinary

-3-

counseling to NARs. This authority is apparently limited to verbally reprimanding individuals who deviate from the nursing home's policies and procedures.

The nurses lack authority to require that an off-duty employee report to work in order to fill a shift vacancy, to order an NAR to perform a particular task, or to authorize an NAR who becomes ill to go home. They also have no authority to affect the job status of an employee by explicitly recommending disciplinary action, termination, or promotion. Moreover, the authority held by the nurses is limited by various procedures and protocols that set forth established guidelines for them to follow in the exercise of their duties. For example, in monitoring the work of NARs, nurses are required to utilize a checklist that sets forth the precise duties to be completed by the team. The nurse simply checks "met" or "unmet" to ensure that each listed duty has been adequately performed.

In January of 1997, the Union filed a petition with the Board seeking certification to act as the collective bargaining agent of the nurses. Beverly opposed this petition, contending that its nurses were supervisors under the definition set forth in section 2(11) of the Act and thereby precluded from inclusion in the bargaining unit. Following a hearing, the Board's Regional Director issued a decision finding that the nurses were not supervisors and were eligible for inclusion in the Union's bargaining unit.

Beverly filed a request for review, which the Board denied. After an election favorable to the Union, the Regional Director certified the Union as the nurses' bargaining agent. Insisting that the nurses were supervisors, Beverly refused to bargain with the Union. The Union then filed an unfair labor practice charge with the Board and a complaint was issued. Following the filing of Beverly's answer, the Board's General Counsel moved for and was granted summary judgment.

## II.

Section 2(3) of the National Labor Relations Act excludes "any individual employed as a supervisor" from the definition of "employee." 29 U.S.C. § 152(3). By doing so, section 2(3) excludes supervisors from protection under the Act. See Waverly-Cedar Falls Health Care Ctr., Inc. v. NLRB, 933 F.2d 626, 629 (8th Cir. 1991). Section 2(11) defines the term "supervisor"as

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

The definition set forth in section 2(11) has two components. See Schnuck Markets, Inc. v. NLRB, 961 F.2d 700, 703 (8th Cir. 1992). First, the employee must have actual authority to accomplish one of the enumerated functions. See id. This requirement is read disjunctively. Thus, if the employee has authority to exercise any one of the enumerated functions, he satisfies the first component of the definition. See id. Moreover, the actual exercise of the enumerated power is irrelevant so long as the authority to do so is present. See Waverly, 933 F.2d at 629. Second, the authority must involve the use of independent judgment and be more than routine or clerical in nature. See Schnuck, 961 F.2d at 703. Thus, "so-called 'straw bosses' are not necessarily supervisors even if they give minor orders or supervise the work of others." Id. (quoting Phillips v. Kennedy, 542 F.2d 52, 56 (8th Cir. 1976)).

Generally, whether a particular employee is a supervisor is a factual question within the Board's special expertise. See Schuck, 961 F.2d at 703. The Board's

findings regarding supervisory status will be upheld so long as they are supported by substantial evidence on the record as a whole.  See Pony Express Courier, Corp. v. NLRB, 981 F.2d 358, 362 (8th Cir. 1992).  Beverly contends, however, that deference to the Board's expertise is inappropriate in light of the Board's pattern of pro-union bias when determining supervisory status.[2]

The Board's treatment of cases involving the supervisory status of employees has prompted more than one court to express a reluctance to accord deference to the Board's findings in such cases.  See, e.g., Spentonbush/Red Star Co. v. NLRB, 106 F.3d 484, 492 (2d Cir. 1997) ("the Board's biased mishandling of cases involving supervisors increasingly has called into question our obeisance to the Board's decisions in this area"); NLRB v. Winnebago Television Corp., 75 F.3d 1208, 1214 (7th Cir. 1996) ("the NLRB's manipulation of the definition provided in [section 2(11)] has earned it little deference").  We have expressed a similar reluctance.  In Schnuck, we noted that "numerous courts have assailed the Board's inconsistent determinations in this regard" and that "our review necessarily becomes more probing when the Board has exhibited a pattern of applying the statute inconsistently."  961 F.2d at 704.

---

[2]Beverly points to NLRB v. Health Care & Retirement Corp. of America, 511 U.S. 571 (1994), as an example of the Board's biased approach in these cases.  In that case, the Board found that a group of nurses employed by a nursing home directed other employees but nevertheless were not supervisors because their authority was exercised not in the interest of their employer, but in the interest of the home's patients.  See id. at 575.  The Supreme Court rejected this approach, chiding the board for creating a "false dichotomy."  Id. at 577.  The Court stated that "[p]atient care is the business of a nursing home, and it follows that attending to the needs of the nursing home patients, who are the employer's customers, is in the interest of the employer."  Id.  Beverly asserts that the Board's employment of this false dichotomy is reflective of its predisposition against finding nurses to be supervisors -- a predisposition that Beverly contends is ongoing.

Thus, a close and thorough examination of the record is called for to ensure that the Board's findings are supported by substantial evidence and that its decision is not arbitrary and capricious. See Winnebago Television, 75 F.3d at 1212. Beverly would have us go further and commence our review with the presumption that the Board's decision was the inevitable product of a pro-union bias. This we will not do. The standard, as we have reiterated many times, is whether substantial evidence on the record as a whole supports the board's determinations. See Schnuck, 961 F.2d at 703. In applying this standard, we consider not only the evidence that supports the Board's determination, but evidence that detracts from the decision as well. See id. at 704.

## III.

The question before us is whether substantial evidence supports the Board's conclusion that the nurses are not supervisors. Beverly contends that the following factors support its argument that the Board erred in finding that its nurses are not supervisors: (1) the nurses have authority to issue "disciplinary counseling" to the NARs; (2) the nurses evaluate the NARs' job performance; (3) the nurses have authority to modify NAR assignments, change break schedules, and fill shift vacancies that arise when NARs call in sick; and (4) the Board's characterization of the ratio between supervisors and employees was inaccurate.

## A.

We begin with Beverly's contention that the nurses possess disciplinary authority. Essentially, Beverly contends that this authority is conferred by a job description that authorizes the nurses to perform disciplinary counseling. The record indicates, however, that this authority is extremely limited. The nurses' power to engage in disciplinary counseling consists solely of the power to verbally reprimand NARs. Although this may constitute disciplinary authority in the broadest sense of the word, these verbal reprimands have no tangible effect on the NARs' job status. We

have held that such negligible disciplinary authority "is not sufficient for supervisory status," <u>Waverly</u>, 933 F.2d at 630, and we conclude that it is likewise insufficient here.

Beverly contends that the nurses are supervisors because they are expected to report violations of its policies and any accidents that occur. Because these reports can ultimately lead to formal discipline, Beverly argues that the duty to report constitutes disciplinary authority under section 2(11). We do not agree. The disciplinary authority contemplated by section 2(11) exists only where an employee exercises independent judgment in prescribing a particular discipline or in recommending that one be prescribed. Here, the nurses are not an integral part of the disciplinary process. They play no role in determining whether an employee is disciplined or in determining the type of discipline to be imposed. Instead, their role is limited to a reporting function and does not require the use of independent judgment. "[T]he mere reporting of facts is not enough to make the reporter a supervisor." <u>Highland Superstores, Inc. v. NLRB</u>, 927 F.2d 918, 922 (6th Cir. 1991).

## B.

We turn next to Beverly's contention that the nurses' duty to complete job evaluations renders them supervisors under section 2(11). To support this contention, it relies on <u>NLRB v. Chem Fab Corp.</u>, 691 F.2d 1252 (8th Cir. 1982), and <u>NLRB v. Ely's Foods, Inc.</u>, 656 F.2d 290 (8th Cir. 1981). In both <u>Chem Fab</u> and <u>Ely's Foods</u>, however, the employees in question were vested with more than simply the authority to evaluate other employees. Rather, they possessed authority to effectively recommend wage increases, discharge, and formal disciplinary action. <u>See</u> <u>Chem-Fab</u>, 691 F.2d at 1256; <u>Ely's Foods</u>, 656 F.2d at 292 n.1. Here, substantial evidence supports the Board's finding that the nurses enjoyed no such authority. Their evaluatory function was instead primarily a reporting function. <u>See</u> <u>Beverly Enterprises-Pennsylvania, Inc. v. NLRB</u>, 129 F.3d 1269, 1270-71 (D.C. Cir. 1997) (upholding finding that nurses were not supervisors where nurses' evaluations had

never resulted in adverse personnel action); <u>NLRB v. Res-Care, Inc.</u>, 705 F.2d 1461, 1467 (7th Cir. 1983) (finding significant the fact that a nurse "cannot cause a nurse's aide to be fired by giving her a poor evaluation or cause her to be promoted by giving her a superlative evaluation").

## C.

Beverly also contends that its nurses have supervisory authority to assign and direct other employees. The nurses are expected to reassign NAR duties, change patient care priorities, and change employee breaks and lunches to avoid shorthanded shifts. Moreover, when a NAR calls in sick or is otherwise unable to work, the nurses are expected to call off-duty NARs to fill the vacant shift.

It is undisputed that the Resident Care Coordinator, a stipulated supervisor, devises the care plan for each of the patients at the nursing home. However, changes in patient condition, changes in personnel, and other circumstances often dictate changes in a particular team's duties and priorities. When this occurs, the nurses are expected to reassign duties and re-prioritize. The Board concluded that to the extent that the nurses assign and direct, such authority does not require the use of independent judgment but is instead narrowly circumscribed by an elaborate system of procedures, policies, and protocol regarding patient care. We find that this determination is supported by substantial evidence. Although the parties dispute the significance of the facility's policies and procedures, we conclude that the Board "has engaged in neither unsupported fact-finding nor arbitrary decision-making" and that its determination "in a close case of this nature" should be upheld. <u>Waverly</u>, 933 F.2d at 631 (Loken, J., concurring). We reach a similar conclusion with regard to the Board's conclusion that the nurses' authority to change lunch times and other break periods to avoid the problem of shorthanded shifts is routine in nature and does not require the use of substantial independent judgment.

Regarding the nurses' duty to contact off-duty NARs to fill in when scheduled NARs are ill or otherwise unable to work, Beverly notes that no established guidelines exist to aid the nurses in determining which off-duty NAR to contact, leaving the matter to the nurses' complete discretion. The record reflects, however, that the nurses have no authority to require or order an off-duty NAR to fill a particular shift. Instead, the nurses' function is limited to seeking off-duty volunteers to help out when the facility is short handed, which falls short of the supervisory authority to assign contemplated by section 2(11).

## D.

The ratio of supervisors to non-supervisory employees is often significant in determining whether an employee has supervisory status. See Schnuck, 961 F.2d at 706; Waverly, 933 F.2d at 630. In calculating this ratio, the Board combined the number of stipulated supervisors with the entire roster of nurses and compared this number to the total number of NARs. Thus, the Board concluded that if the nurses were supervisors, the resulting ratio would have been eighteen supervisors to twenty-eight non-supervisory employees. As the Board recognized, this ratio of less than one to two is unreasonably high. Beverly contends, however, that the Board's ratio calculation is misleading because there are never eighteen supervisors on duty at one time.

This argument ignores the fact that the number of NARs on duty at a particular time is also significantly lower than twenty-eight. On a typical day shift, for instance, the number of NARs on duty is approximately six, while the number of stipulated supervisors and nurses is typically seven, resulting in a disproportionate ratio if the nurses are considered supervisors. The results are not substantially different for the evening and night shifts. When the stipulated supervisors are not on the premises, the ratio during the evening shift would typically be three supervisors to six non-

-10-

supervisory workers, or one to two. The night shift ratio is identical, with one supervisor and two non-supervisory employees on duty.

Beverly also notes that because the stipulated supervisors are generally not on the premises during much of the evening shift and all of the night shift, the nurses are generally the highest ranking employees on the premises for a large percentage of the facility's hours of operation. Thus, if the nurses are not considered supervisors, the facility is left without on-site supervision for the majority of its hours of operation. In Waverly, we indicated that on-site supervision is not necessary so long as off-duty supervisors are on call, stating:

> As Waverly notes, if the LPNs are not supervisors, then the facility is "unsupervised" during the majority of its hours of operation. However, both the Director and Assistant Director of Nursing are on call twenty-four hours a day. Moreover, the test for supervisory status requires the exercise of independent judgment; the record indicates that LPNs merely follow routine procedures while they are "in charge."

933 F.2d at 630. We reached a contrary result in Schnuck. There we stated:

> In NLRB v. Beacon Light Christian Nursing Home, 825 F.2d 1076, 1080 (6th Cir. 1987), the Sixth Circuit concluded that the Board's determination that licensed practical nurses were not supervisors meant that fifteen to thirty nursing personnel were providing patient care with no on-site supervision. "This is not a reasonable conclusion for a well-run nursing home." Id. Nor is it a reasonable conclusion to suppose that Schnucks would operate one of its largest stores for eight hours every day with twelve to sixteen employees on staff without on-site supervision.

961 F.2d at 706.

In Schnuck, the unsupervised staff consisted of twelve to sixteen employees. See 961 F.2d at 706. In Waverly, on the other hand, the unsupervised nursing staff was significantly smaller. Moreover, in Waverly we placed emphasis on the fact that stipulated supervisors, although not on the premises, were on call twenty-fours hours a day. See 933 F.2d 630. There is no indication in Schnuck that the stipulated supervisors were on call or even accessible while absent from the premises.

In the present case, it is undisputed that one of the four stipulated supervisors is at all times readily accessible via telephone or pager. We conclude that where this is the case, the highest ranking on-site employee will not invariably be considered a supervisor. See Waverly, 933 F.2d at 630; Res-Care, Inc., 705 F.2d at 1467 (fact that nurses are highest ranking employees on the premises during the evening and night shifts "does not ipso facto make them supervisors"). This is especially true where, as here, the record indicates that the employees left in charge merely follow routine procedures and do not exercise independent judgment. See Waverly, 933 F.2d at 930.

We conclude that the Board's determination that the nurses are not supervisors under section 2(11) is supported by substantial evidence. Accordingly, we deny Beverly's petition for review, and we enforce the Board's order.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-